Jeffrey Goulder (No. 010258)
Michael Vincent (No. 029864)
Clarissa C. Brady (No. 036312)
**STINSON LLP**
1850 N. Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Jeffrey.Goulder@stinson.com
Michael.Vincent@stinson.com
Clarissa.Brady@stinson.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>Skyler Aaron Cook,<br><br>Debtor. | Chapter 7<br><br>Case No. 2:20-bk-01730-EPB |
| James E. Cross, Trustee,<br><br>Plaintiff,<br><br>vs.<br><br>Valliance Bank and Shelby Bruhn,<br><br>Defendants. | Adversary No. _____<br><br>**COMPLAINT** |

Plaintiff, James E. Cross, in his capacity as Chapter 7 Trustee, for his Complaint against Defendants, alleges as follows:

### PARTIES AND JURISDICTION

1. Plaintiff James E. Cross is the Chapter 7 Trustee of the bankruptcy estate of Skyler Aaron Cook ("Cook").

2. Valliance Bank ("Valliance") is a banking corporation organized under the laws of the State of Oklahoma.

3. Shelby Bruhn ("Bruhn") is the Chief Lending Officer and Texas Market President at Valliance Bank and, upon information and belief, a resident of the State of Texas.

4. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334. Plaintiff asserts the claims herein pursuant to 11 U.S.C. § 544(a) under the so-called "strong arm" powers to assert such claims on behalf of creditors of the bankruptcy estate. Such claims are related to the above captioned bankruptcy case currently pending before this Court pursuant to the Bankruptcy Code.

5. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).

6. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

7. In 2018 and 2019, Debtor Skyler Cook ("Cook") was engaged in the business of purchasing, repairing/upgrading, and selling residential real estate.

8. The primary business entity used by Cook for this "fix and flip" enterprise was Buddy's Renovation & Handyman Services, LLC ("BRHS").

9. Cook was an owner and the manager of BRHS.

10. Cook also owned or managed numerous business entities in addition to BRHS, including CMI Industries; CMC Industries, LLC; CKE Realty Fund, L.P.; CKE Fund Management, LLC; CKE Holdings, LLC; and CKE Home Management, LLC.

11. Beginning in early 2018, Cook operated a scheme in which he solicited investments in and loans to BRHS, promising those investors that he would repay their money in full, plus a significant amount of interest.

12. Between May 2018 and August 2019, Cook collected more than $4 million from investors.

13. During that time span, Cook represented to potential investors that his fix and flip business was profitable and lucrative.

14. In 2018, Cook opened several accounts at Valliance for BRHS, including a

payroll account with an account number ending in 2806 and an operating account with an account number ending in 8416.

15. Cook also opened other accounts with Valliance in 2018, including a CMC Industries operating account having an account number ending in 8572, a CKE Holdings operating account with an account number in 8408, a CKE Home Management operating account having an account number ending in 8606, a CKE Fund Management account having an account number ending in 2657, and a CKE Realty Fund account having an account number ending in 2665.

16. In October 2018, Cook met with Valliance's vice-president Bruhn and discussed his fix-and-flip business.

17. Following that meeting, Valliance began providing loans to BRHS for BRHS's acquisition of the properties used in the fix-and-flip business.

18. Bruhn and Cook enjoyed a close relationship beginning in 2018. In addition to their various business dealings, Bruhn and Cook sometimes met socially for lunch or dinner.

19. Bruhn himself purchased three houses at Cook's recommendation and hired BRHS to renovate those homes for resale, creating a potential conflict of interest with his employer and a possible violation of Valliance's code of conduct.

20. On October 17, 2018, Brad Johnson, an associate of Cook, emailed Parker Keane, a potential investor, with a cc: to Bruhn and Cook, stating that he wanted to introduce Keane to Bruhn with Valliance; that Valliance would be providing all the financing on BRHS projects; that Bruhn would respond with additional items for Keane to get set up; and that Keane could reach out to Johnson, Cook, or Bruhn with any questions.

21. Cook often termed his loan requests to individual investors as "partnership agreements."

22. In 2019, Cook entered into at least six partnership agreements with investors, which resulted in BRHS receiving $1,265,000 in cash between January through

August 2019.

23. Bank statements for BRHS accounts show that BRHS received an additional $1,271,997 in incoming wire transfers during 2019.

24. As an example of the business structure, in August 2019, BRHS signed a partnership agreement with Brian Shahan, in which Shahan invested $200,000 in BRHS in exchange for a "Guaranteed Quarterly Return of 5%" and a return of principal in July 2020.

25. The partnership agreement also stated that "BRHS, LCC [sic] will be guaranteeing a 20% annual return on subject properties, owned and operated by BRHS, LLC. The financial investment is guaranteed and backed by BRHS, LLC and on the personal financials of Skyler Cook as well as subject properties being worked."

26. The partnership agreement also stated that "BRHS is in a growth mode. Inventory of homes are presented on a daily basis and the opportunity to purchase these homes is being passed upon due to bandwidth of crews. We are constantly looking for the right people to be on the team .... The working capital will go towards the ability to say yes to these people when the time comes."

27. Upon information and belief, all of the other partnership agreements contained substantially-similar language.

28. Beginning in November 2018, BRHS had difficulties meeting payroll.

29. For example, on November 28, 2018, an accountant with Cook's CPA, Badger CPA Firm, emailed Cook to inform him that the payroll account for BRHS had only $170.48 in the account but payroll that Friday required $17,772.22.

30. According to the financial statements produced by Cook's CPA, BRHS had a net income of -$686,062.19 for year 2018.

31. Despite BRHS' representation to investors or potential investors, throughout 2019, BRHS experienced growing financial distress.

32. Cook used a fraudulent financial statement to solicit investments in BRHS, showing the fraudulent statement to at least six investors.

Bounced Checks

33. Between January 2019 and August 2019, Cook's entities bounced checks drawn on accounts held at Valliance at least **257 times**.

34. Valliance's January 2019 statement for BRHS's operating account showed that BRHS bounced 73 checks and incurred $2,190 in bounced check fees.

35. Valliance's February 2019 statement for BRHS's operating account showed that BRHS bounced 11 checks and incurred $330 in bounced check fees.

36. Valliance's March 2019 statement for BRHS's operating account showed that BRHS bounced 43 checks and incurred $1,290 in bounced check fees.

37. Valliance's April 2019 statement for BRHS's operating account showed that BRHS bounced 45 checks and incurred $1,350 in bounced check fees.

38. Valliance's May 2019 statement for BRHS's operating account showed that BRHS bounced 35 checks and incurred $1,050 in bounced check fees.

39. Valliance's June 2019 statement for BRHS's operating account showed that BRHS bounced 31 checks and incurred $930 in bounced check fees.

40. Valliance's July 2019 statement for BRHS's operating account showed that BRHS bounced 15 checks and incurred $450 in bounced check fees.

41. Valliance's August 2019 statement for BRHS's operating account showed that BRHS bounced 4 checks and incurred $120 in bounced check fees.

42. On numerous occasions, some of which are listed below, Valliance employees informed Cook regarding overdrafts in the BRHS account and copied Bruhn on many of those emails.

43. Upon information and belief, Bruhn was aware of these instances of overdrafts and bounced checks.

44. On September 21, 2018, Karin Hubman, a Loan Administrative Assistant with Valliance, emailed Cook to verify that Valliance was moving $6,401.75 from BRHS's operating account to the payroll account to cover a negative balance.

45. On January 15, 2019, Trinika Johnson ("Johnson"), a lending assistant with

Valliance, emailed Cook to ask if Cook would be making a deposit that day into the BRHS account.

46. On February 15, 2019, Johnson emailed Cook to report that a check had been returned as altered/fictitious and that BRHS would be charged back.

47. On April 25, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's account was overdrawn by $32,359.34.

48. On May 2, 2019, Jennifer Lane at Valliance notified Teresa Anderson, an investor in BRHS, that checks from BRHS had been rejected for insufficient funds.

49. On May 10, 2019, Johnson emailed Cook, cc: to Bruhn, to ask if Cook would be making a deposit to cover an overdraft.

50. On May 16, 2019, Johnson emailed Cook, cc: to Bruhn, to state that Bruhn was in a board meeting that morning and Valliance needed a deposit to cover an overdraft in the BRHS operating account by noon that day.

51. On May 17, 2019, Chassidy Walker, a Deposit Operations Manager with Valliance, emailed Cook to state that one of Cook's accounts, *8408, was recently reopened and two pending transfers needed to be resubmitted.

52. On May 17, 2019, Johnson emailed Cook, cc: to Bruhn, asking Cook to transfer funds from the BRHS payroll account to the operating account to cover the overdraft in the operating account.

53. On May 28, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's payroll account was overdrawn by $21,989.71.

54. On May 29, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's payroll account was overdrawn by $21,947.41.

55. On June 4, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating and payroll accounts were both overdrawn.

56. On June 5, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

57. On June 7, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's

operating account was overdrawn.

58. On June 10, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

59. On June 11, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating and payroll accounts were both overdrawn.

60. On June 12, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating and payroll accounts were both overdrawn.

61. On June 13, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

62. On June 17, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

63. On June 21, 2019, Johnson and Cook emailed regarding checks that Valliant had determined were fraudulent.

64. On June 24, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's payroll account was overdrawn.

65. On June 28, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

66. On July 3, 2019, Johnson emailed Cook, cc: to Bruhn, stating that a large check posting to the BRHS operating account caused it to be overdrawn by $41,025.

67. On July 5, 2019, Johnson emailed Cook, cc: to Bruhn, stating that items posting to the BRHS account caused it to be overdrawn by $34,440.07.

68. On July 9, 2019, Johnson emailed Cook, cc: to Bruhn, stating that a large American Express payment posting to BRHS's operating account was causing the account to be overdrawn by $43,248.40.

69. On July 15, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

70. On July 16, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's account was overdrawn.

71. On July 19, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

72. On July 23, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

73. On July 24, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

74. On July 26, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's operating account was overdrawn.

75. On July 29, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's payroll account was overdrawn.

76. On August 2, 2019, Johnson emailed Cook, cc: to Bruhn, stating that BRHS's payroll account was overdrawn by $101,000 and CKE Holdings' account was also overdrawn.

77. On August 8, 2019, Johnson emailed Cook with a cc: to Bruhn, stating that BRHS's operating account was currently overdrawn because of a credit card payment.

<u>Shifting Funds Between Accounts</u>

78. Valliance and Bruhn knew that Cook was repeatedly shifting funds between accounts to cover overdrafts, a suspicious activity (Ponzi scheme) that was reportable under Valliance's anti-money laundering (AML) policies and procedures.

79. One of the hallmarks of a Ponzi scheme is moving money from one account to another where monies from new investors is used to cover payments to earlier investors, and large deposits with extremely low account balances. Such transactions serve no legitimate business purpose and as such should have been identified, investigated, and reported as "suspicious" transactions under Valliance's anti-money laundering (AML) program.

80. For January 2019, BRHS's operating account had an average daily balance of $4,496.93 but $410,708.31 in deposits for the month.

81. For February 2019, BRHS's operating account had an average daily balance

of $15,370.51 but $354,088.88 in deposits for the month.

82. On March 28, 2019, Cook transferred $100,000 from the BRHS payroll account to the operating account.

83. For March 2019, BRHS's operating account had an average daily balance of $8,643.02 but $415,093.36 in deposits for the month.

84. For April 2019, BRHS's operating account had an average daily balance of $15,681.73 but $763,709.91 in deposits for the month.

85. For May 2019, BRHS's operating account had an average daily balance of $6,673.82 but $251,138.96 in deposits for the month.

86. For June 2019, BRHS's operating account had an average daily balance of $1,473.95 but $78,063.66 in deposits for the month.

87. Cook regularly shifted funds among his accounts at Valliance and at other banks. In addition to writing large numbers of checks between accounts, he would transfer money back and forth. For example, in February 2019, BRHS's operating account received $22,000 from the CKE Holdings operating account and $33,000 from BRHS's payroll account.

88. As another example, in March 2019, BRHS's operating account received multiple transfers from the CKE Holdings operating account: $65,000 on March 1, $10,000 on March 4, $15,000 on March 4, and $10,000 on March 5.

89. In addition to these transfers, Cook frequently deposited a high volume of checks drawn on his other accounts into the BRHS operating account, and vice versa.

<u>Cook Breached His Fiduciary Duty to His Investors</u>

90. Cook solicited and collected investments through August 2019. For example, he solicited a loan of $150,000 in August 19 that promised $50,000 interest in 60 days.

91. On August 29, 2019, Cook obtained a $200,000 investment in BRHS from Brian Shahan with a "partnership agreement" calling for a 20% annual return.

92. As of August 29, 2019, Cook knew that BRHS had lost more than $3 million

but failed to disclose this fact to Shahan.

93. Cook failed to disclose to investors in 2019 that BRHS had lost money in 2018 and was repeatedly shifting funds between bank accounts and entities to remain solvent.

94. Cook failed to disclose to investors who lent money to BRHS after November 2018 that BRHS had a substantial loss in 2018 or had previously experienced financial difficulties and insolvency, such as the shortfall in the BRHS payroll account in November 2018.

95. Cook failed to disclose to investors that BRHS and his other entities were in deteriorating financial condition beginning no later than November 2018.

96. Cook failed to disclose to investors that he was engaged in circular intercompany transactions (i.e. a Ponzi scheme) to maintain the appearance of liquidity in his various accounts.

97. Cook owed a fiduciary duty to his investors to disclose all material facts surrounding their investments in BRHS, including his financial difficulties, the fact that BRHS had lost substantial amounts of money in 2018, and that Cook was transferring funds between accounts to keep his entities afloat.

98. Cook owed a fiduciary duty to his investors to keep their funds segregated in the respective entity in which they invested, and not commingle funds.

99. Cook breached his fiduciary duties to his investors.

100. Cook's breach of his fiduciary duties to investors caused the investors to suffer losses.

### Valliance Should Have Closed Cook's Accounts and Reported Cook's Activities to Its Regulators

101. By fall 2019, Cook had run out of money; informed his investors that he was shutting down; and filed for bankruptcy.

102. Cook, however, had been overdrafting regularly from his Valliance bank accounts since November 2018.

103. Valliance had a duty to detect and prevent Ponzi scheme activities and suspicious "red flag" transactions that served no legitimate business purpose.

104. Normal and customary banking practices would have resulted in the closure of Cook's accounts at Valliance because of the repeated overdrafts.

105. Valliance violated internal bank policies and procedures developed in support of federal banking laws regarding unauthorized extensions of credit by clearing checks against insufficient funds.

106. Valliance should have flagged Cook's activities as suspicious because of the unusual activities in the accounts, including consistently large volumes of deposits with extremely low account balances, significant numbers of insufficient funds checks returned, and other suspicious account transactions, which appeared to be inconsistent with the operation of the underlying business.

107. Valliance instead allowed Cook to operate his accounts in overdraft for extended periods of time, which is a violation of federal safety and soundness laws, as well as customary banking practices.

108. Valliance should have flagged Cook's repeated circular intercompany transactions, including depositing checks and transfers between accounts, as suspicious transactions which served no legitimate business purpose.

109. Instead of closing Cook's accounts, Valliance and Bruhn suggested that Cook shift funds from one account to another to cover the overdrafts, despite each account holding funds from different investors.

110. By allowing Cook's accounts to remain open, Valliance showed willful blindness, and aided and abetted Cook's scheme, which allowed Cook to obtain additional investments that were subsequently lost to the investors.

## COUNT I

### Aiding and Abetting Breach of Fiduciary Duty

111. Plaintiff incorporates the foregoing paragraphs as if set forth herein.

112. Valliance and Bruhn knew that Cook was continuing to solicit investments

in BRHS despite BRHS continually bouncing checks and engaging in transfers to cover overdrafts.

113. Valliance and Bruhn knew that Cook was breaching his fiduciary duties to his investors because the Valliance account statements, among others, showed that Cook was receiving new investments throughout 2019 while Cook was also bouncing checks, incurring repeated overdrafts, and transferring funds between accounts to cover liquidity problems.

114. After Bruhn met with Cook in October 2018, Bruhn understood the operation of BRHS and Cook's operation of soliciting investments in BRHS from third party investors.

115. Bruhn was also aware of Cook's substantial overdrafts and bounced checks throughout 2019.

116. Furthermore, as the Texas president of Valliance, Bruhn's knowledge is imputed to Valliance.

117. Valliance and Bruhn also knew of Cook's business practices because they had approved loans from Valliance to Cook's entities for the various real estate properties that Cook would purchase as part of his scheme in which he solicited third party investments.

118. Valliance and Bruhn substantially aided Cook's scheme by allowing him to maintain accounts at Valliance through 2019 in violation of sound banking practices and federal laws, by allowing him to continually bounce checks during 2019, and suggesting that Cook commingle accounts to cover overdrafts, among other acts.

119. But for the willful blindness of Valliance to these suspicious transactions, Cook would not have been able to continue soliciting additional investments and commingling investor accounts.

120. Valliance and Bruhn's conduct was a substantial factor causing harm to Cook's investors.

Case 2:20-bk-01730-EPB    Doc 298    Filed 12/30/21    Entered 12/30/21 10:25:13    Desc
Main Document    Page 12 of 14

## COUNT II

### Negligence (Against Valliance Only)

121. Plaintiff incorporates the foregoing paragraphs as if set forth herein.

122. Cook owed fiduciary duties to all of his investors.

123. Bruhn knew of Cook's business operations, his solicitation of investments, and the general structure and operation of Cook's entities, including BRHS.

124. Bruhn knew that Cook owed fiduciary duties to his investors.

125. Bruhn knew or should have known that Cook's repeated overdrafts and intercompany transactions violated Cook's fiduciary duties to his investors.

126. Bruhn knew that Cook was misappropriating funds in his accounts, including the BRHS accounts, based upon, among other things, the frequent intercompany transfers.

127. Bruhn assisted Cook in committing the misappropriations by, among other things, privately meeting with Cook, lending his and Valliance's name to help Cook solicit new investments (for example, the October 17, 2018 email from Brad Johnson to Parker Keane)

128. As an officer of Valliance, Bruhn's knowledge is imputed to Valliance.

129. Valliance owed a duty of care to Cook's investors to prevent Cook from using Valliance as a vehicle for furthering his breaches of the investors' fiduciary duties.

130. Valliance breached its duty of care.

131. As a direct and proximate cause of Valliance's breach of its duty of care, Cook's investors were damaged.

### PRAYER FOR RELIEF

Plaintiff requests judgment in his favor against Defendants for damages in an amount to be proven at trial and any other relief that the Court deems just and proper.

| | |
|---|---|
| 1 | DATED this 30th day of December, 2021. |
| 2 | **STINSON LLP** |
| 3 | |
| 4 | /s/ *Clarissa C. Brady* |
|   | Jeffrey Goulder |
| 5 | Michael Vincent |
|   | Clarissa C. Brady |
| 6 | 1850 N. Central Avenue, Suite 2100 |
|   | Phoenix, Arizona 85004-4584 |
| 7 | |
|   | *Counsel for the Plaintiff* |

I hereby certify that on December 30, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

/s/ Lindsay Petrowski

CORE/3524238.0002/171304656.2